Gould J.
This case comes up on a very narrow question. It is entirely plain, and is, indeed, conceded on the argument, that the deceased, Mr. Douglas, was a competent, energetic man, who, with a full understanding of what he was doing, *424 had made several different wills. And there can be no doubt that, as to the will propounded for probate, he perfectly under- . stood what he was doing in executing it, and that he intended to execute it according to the requirements of the law, and thus make it effectual as a disposition of his property. To do this, he (as is fully proved and not here questioned) signed it himself in the presence of two witnesses; he requested the two witnesses to sign it, and they did so in his presence. There is only one other requisite to due execution, and that is, that he should, in the presence of) or to both witnesses, have declared it to be his will, thus making due publication of his act.
One of these witnesses, Starr, had been, for some hours immediately preceding the execution, engaged in the presence of Mr. Douglas in drawing the will; the. other witness, Mary Fitzgibbon, was a servant in the house, and was called in by Starr to witness the execution. Starr states that Mr. Douglas, in his presence, not merely stated to Mary F. that it was his will, but explained the fact to her at some length. She, on the other hand, says that Mr. D. did not, to her, call it his will; and that she does not remember (what Starr states) that he said it was such a paper as she signed a short time before, and which she knew to be a will. She says that Starr, in Mr. D.’s presence, told her that the paper she was called to sign was Mr. D.’s last will; but that (as Mr. D. was quite deaf) she don’t think Mr. D. “ heard all of what Starr said.” If he did hear it, or so much of it as that it was his will, the execution is fully made out, as there is no pretence of any dissenting by him from what Starr said.
This is certainly reducing the question to a very narrow compass, and it would seem to be too narrow to conform to the well-sanctioned rule that, in regard to the whole matter of wills apd their execution, the substance of the testator’s acts (they being such as the law recognizes) is to govern in preference to any formal or literal following of the words of the statute. (26 Barb., 77; 23 N. Y., 15.)
Take, then, -the whole transactions of the day when the will Was executed, and consider them as a whole, and can there be *425 any doubt that Mr. D. intended that Starr was to see that the will was duly executed, and that, whether or not he distinctly heard every word that Starr said to the other witness, he knew what was going on, and heard enough to keep himself fully aware of what Starr was doing and the substance of what he was saying. This court has no doubt on that point, and we consider the execution of the will fully proved. By adopting such a course in regard to the execution of this or of any will, we incur no danger of failing to carry out the purpose of the statute. That purpose is to make sure that the testator is aware that he is making a will, and that he be not imposed on and procured to sign a will when he supposes it to be some other instrument. The witnesses’ knowing it to be a.will is of no moment, except as their being.then and there, in his presence or by him told so, makes it certain that he knows it to be such an instrument. It is, of course, too late to claim that the facts making due execution must all, or any of them, be established by the concurring testimony of the two subscribing witnesses. -Both of those witnesses must be examined, but the will may be established,* even in direct *426 opposition to the testimony of hoth of them. This is too well settled to call for the citation of authorities.
*427 It would seem that the decision of the Supreme Court, and that of the surrogate, should be reversed; and the surrogate *428 would be directed to admit the will to probate, except that the statute compels this court to remit the case to the Supreme Court for a trial by jury on the one question of fact.
*429 Selden, J., took no part in the case; all the other judges concurring,
Judgment reversed.

 The principal authorities are collected in the followirig opinion delivered at June term, 1862, in the case of Tarrant v. Ware, arising upon the probate of the will of Mrs. Eliza Ware. The whole court concurred in establishing the will upon the testimony of one witness.
DENIO, J. The only question which admits of argument arises out of the position that the publication of the instrument as the testatrix’s will was not made in the presence of one of the subscribing witnesses, and that the attestation of that witness was”not made at the request of the testatrix. The two attesting witnesses were H. B. Newton and Mrs. Quimby. The former drew the will, and he testified before the surrogate that the testatrix declared it to be her will in the presence of Mrs. Quimby as well as of himself, and that she requested them both to sign it as witnesses. Mrs. Quimby, on the contrary, though she signed her name to a full attestation clause, testified before the surrogate that she was not requested by the testatrix to sign the will as a witness, and that there was no publication of the instrument as her last will and testament. Her account of the matter is, that being at the time on a visit at the house of Mr. Ware, she was called by him in£o the room where Mrs. Ware, the testatrix, (who was her aunt,) was lying in bed; that the will was then placed before the
*426 testatrix, who signed it, and that it was then signed by Newton, who directed her, the witness, to sign under his name, which she did. She testified that during this time nothing was said by any person in the room except what fell from Newton in requesting her to sign, and except that when the testatrix was affixing her signature, her husband, who was standing at the foot of the bed, desired her to hurry. She moreover declared that she did not know that the instrument was a will until after the death of Mrs. Ware. If the facts are as stated by her, the will was not duly executed, and it ought to have been refused probate.
Prior to any adjudication upon the subject, it might have been argued with some plausibility that the nature and objects of the provisions declaring a certain number of subscribing witnesses necessary to a valid will, required that the number specified should unite in testifying to an execution and attestation of the instrument in the manner required by the act; or at least that the will could npt be established if a part or all of them should deny the existence of facts requisite to show a proper execution. The witnesses were supposed to be persons selected by the testator to bear witness that he had actually executed the paper, with'a knowledge of its contents and in the form prescribed by law, and that he was of suitable age and capacity and was not under restraint. If the persons thus selected could not or would not affirm the existence of these facts, the intention of the law, it might be said, would not be answered. Without the statute the execution of a will could be established by the testimony of persons who knew the facts, though not specially designated as witnesses to them; and who did not sign the paper, or by circumstances without direct testimony. The legislature, thinking this too uncertain a mode of proof, prescribed additional safeguards; but if the testimony of the chosen witnesses, when unfavorable to the will, could be disregarded, a will may be set up and established by testimony not authorized by the statute and which the legislature had not considered perfectly safe in ordinary cases. But.on the other hand it was soon seen that the attesting witnesses might forget the facts to which they had once attested, and that it was not impossible that they might be tampered with by interested parties, and thus be induced to deny on oath’the facts which they had been selected to witness and to depose to. This view prevailed with the courts. The first act which required subscribing witnesses to a will was the statute of frauds (29 Charles II, ch. 3), the fifth section of which enacted that all devises of land should be in writing and should be signed by the party so devising the same, * * * and should be attested and subscribed in the presence of said devisor by three or four credible witnesses, or else should be utterly void. Five years after the passing of the act, in the 34th year of the same reign, Hudson's Case canfe before the Court of King’s Bench. It was a *427 trial at bar, and involved the validity of Hudson’s will. Two of the witnesses swore that Hudson did not publish it as his will, but that A. B. guided Hudson’s hand, and Hudson made his mark but said nothing, nor was he capable. On the other side it was proved, as the report states, how that Hudson had made two former wills and in them had divided his land in the like manner as in this will, and how that he died of a consumption and was sensible to the last; and how that three days after making his last will he was sensible and able to discourse, and so continued until six days of his death; hereupon it was plain to the court that the witnesses had been dealt with; to which the counsel of the other side urged that if the witnesses were not to be believed then there would not be three witnesses to the will, and so no will within the statute of frauds and perjuries. To which Pemberton, Chief Justice, answered that if there were three witnesses to a will whereof one was to his own knowledge a thief or person not credible, yet the words of the statute being .satisfied and he having collateral proof to fortify the will, he would direct a jury to find it a good will; and as in this case he said that it is not probable that a person in his-senses (as they here are not able to disprove him to be) would suffer another to guide his hand to a writing and not say anything, and that therefore they took it that he did publish it; and remembered Diggs' Case in C. B. where the scrivener wrote the will, and two others were witnesses. The sgrivener swore the testator was compos, the two others swore he was not compos. The court stopped these two till the verdict was brought in, which found the will a good will, and then committed the two witnesses to the Fleet, for that if this was suffered it would be in any man’s power to destroy another’s will. So likewise did the court of K. B. here commit the witnesses and took security of the plaintiff to prosecute them for peijury. (Skinner, p. 29.)
In Rice v. Oatfield (Strange, 1096), a case of Pike v. Badmering is mentioned as having been decided in Lord Chief Justice Pratt’s time, where the three subscribing witnesses to a will were called and denied their hands, but the court admitted the plaintiff to contradict them, and the will was supported against their evidence.
In Goodlittle v. Clayton (4 Burr., 22, 24), which was ejectment by the heirs of law against one claiming under the will of the ancestor, one of the attesting witnesses swore against his own attestation, and the defendant had a verdict. The Court of King’s Bench ordered a new trial. Lord Mansfield said there were several cases both of bonds and wills where the instrument had been supported against the oath of the attesting witnesses by the testimony of other witnesses. He added, “ It is of terrible consequence that witnesses to wills should be tampered with to deny their own attestation.”
*428 Windham v. Chetwind (4 Burr., 414), turned upon a question not material to the present case; but Lord Mansfield, to illustrate his argument, put the case of all the witnesses to a will denying that - the testator executed it, yet he said the attestation would answer the necessary form, because the testator meant to comply with the law and might not know the witness to be a bad man.
Again, in Lowe v. Jolliffe (1 Wm, Bl., .365), upon an issue of devisavit vel non out of Chancery, all the subscribing witnesses to a will swore that the testator was utterly incompetent. But an attorney of unblemished reputation, and other persons, gave evidence to the contrary, and upon the whole, the reporter adds, “ it appeared to be a very 'black conspiracy to set aside the gentleman’s will without any foundation whatever.” The jury found in favor of the will, and the attesting witnesses were after-wards convicted of pequry. (The King v. Nueys, id., 416.)
I have referred to these cases somewhat at large, because the more modern ones, to be presently mentioned, present only instances of forgetfulness on the part of the attesting witnesses; and my purpose is to show that whether their denial of what they had attested proceeds from perversity or want of recollection, the testament may in either case be supported.
Since the English statute of wills of 1837, which requires testamentary dispositions of personalty as well as devises of land to be attested, questions like that under consideration have.frequently come before the ecclesiastical courts. In Gove v. Garwm (3 Curteis, 151), one of the witnesses deposed that the will was not signed by the testator in his presence; but the other witness proved a full execution in the presence of both. The will was established upon circumstances showing the stronger probability of the accuracy of the last mentioned witness. In Chambers v. The Queen's Proctor (2 id., 415), and in Blake v. Knight (3 id., 549), wills were established against the testimony, in the first case of two out of three witnesses, and in the other of all the witnesses, upon circumstances showing the strong probability of a proper execution. The facts sometimes relied upon were a full attestation clause, the superior intelligence of the witnesses who swore to a due execution, the greater value of affirmative as contrasted with negative testimony, the circumstance, in one case, that the witness who was favorable to the will had made an affidavit of the facts soon after the execution, while the one who testified against the execution was not examined until two years and a half afterwards. The principle that wills may be sustained under such circumstances has been sanctioned in the courts of this State. In Jauncey v. Thorne (2 Barb. Ch., 40), there were three witnesses, one of whom denied that the testator declared the instrument to be his will, and said he did not know it was of that character *429 until afterwards, but the two others heard him declare it to be his will, but said he did not sign or acknowledge the signature in their presence. The Chancellor, however, came to the conclusion that all the formal requisites were observed in the presence of all • the witnesses, and he laid it down as a settled principle that it was not necessary that every witness should be able to show that all the requisites of the statute were complied with. The points respecting which the difficulty existed were affirmed in. the attestation clause, and there were other circumstances leading to the conclusion which was reached by the court. In Nelson v. McGiffert (3 id., 158), two of the three witnesses could not recollect that the testator requested them to sign, though they had all signed the attestation clause, and the other witness swore to having signed- at the testator’s request. The Chancellor had no difficulty in establishing the will.
But if, on examining all the witnesses and considering the attending circumstances, a reasonable doubt remains whether one or more of the directions of the statutes have not been omitted, the probate must be refused, although it may appear probable that the paper expresses the testator’s intentions. Such was the result in Noding v. Alliston, in the Prerogative Court (2 Eng. Law & Eq. Rep., 594), and in Chaffee v. The Baptist Missionary Convention (10 Paige, 85). It remains to determine the question of fact in the present case, namely, to which of the witnesses credit should be given.
The learned judge proceeded to discuss the evidence, and arrived at the conclusion that the judgment appealed from, which established the will, must be affirmed.
Judgment affirmed.